22nd JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. TAMMANY

STATE OF LOUISIANA

NO.:  2015-11294                                      DIVISION:   J

JESSICA L. VALDERRAMA

VERSUS

JOURNEYMAN CONSTRUCTION, INC. AND WAL-MART STORES, INC.

FILED: _April 7, 2015_                    S/VERONICA FELTS-FRECHOU
                                          DEPUTY CLERK

### PETITION FOR DAMAGES

NOW INTO COURT, through undersigned counsel, comes Plaintiff, Jessica L. Valderrama, who respectfully files this Petition for Damages, presenting allegations and causes of action as follows:

1.

Plaintiff, Jessica L. Valderrama, is an individual domiciled in Slidell, Louisiana, the Parish of St. Tammany, State of Louisiana.

2.

Defendant, Journeyman Construction, Inc. ("Journeyman"), is a foreign corporation doing business in the state of Louisiana, with its Registered Office located in Baton Rouge, Louisiana.

3.

Defendant, Wal-Mart Stores, Inc. ("Wal-Mart"), is a foreign corporation doing business in the state of Louisiana, with its Registered Office located in Baton Rouge, Louisiana.

4.

This Court has the legal power to hear and determine this matter because the value of the claims asserted herein, exclusive of interest, court costs, attorney's fees or penalties, exceeds the amount required to confer jurisdiction with this Court.

**EXHIBIT**

_1_

FAX FILED
3/30/15

5.

Venue is proper in this Court pursuant to Louisiana Code of Civil Procedure Articles 42(2), 72, 73, 74, 76.1. The offenses and quasi offenses alleged occurred within St. Tammany Parish.

**GENERAL ALLEGATIONS**

6.

On or about January 22, 2010, Plaintiff purchased a residential home with the physical address of 108 Sugar Mill Drive, Slidell, Louisiana, at a price of $154,000. Plaintiff resided in the home as her primary residence.

7.

In February or March of 2014, Journeyman, on behalf of Wal-Mart, began clearing the property directly behind Plaintiff's residence for the construction of a Wal-Mart Neighborhood Store. Initially, Plaintiff experienced no detrimental effects from the construction on behalf of Wal-Mart.

8.

However, Plaintiff later began to notice her neighborhood streets began to retain excessive water to the point of flooding due to drainage being diverted from the Wal-Mart construction. Eventually, her backyard, which had never retained water before, began to flood due to the elevation of the Wal-Mart property, several feet above the level of her back yard.

9.

On or about June 6, 2014, Plaintiff, who intended to sell her home, was given a market value of the home by her realtor of approximately $180,000. According to market practice, Plaintiff listed her home for sale with the realtor in the amount of $184,900, which was deemed a reasonable and accurate price by the realtor.

10.

In July of 2014, Plaintiff began to notice damage to her home including cracks in the floors, walls and ceilings, which damage was deemed structural and significantly reduced the value of her home.[1]

11.

Although Plaintiff's home is still structurally sound enough to be inhabited, the home shows numerous signs of distress caused directly by the construction of the Wal-Mart behind Plaintiff's home.[2]

12.

As a result of the structural damage caused by the activities of Journeyman on behalf of Wal-Mart, Plaintiff will need to re-level her home. She obtained an estimate from ECO Builders, Inc. for the re-leveling of the home that totals approximately $18,800. This amount is merely an estimate and subject to change upon completion of the work, depending upon any damages that could result from the re-leveling process.[3]

13.

In addition, the cracked and damaged flooring, which occurred as a direct result of the construction by Journeyman on behalf of Wal-Mart, will need to be replaced. Plaintiff obtained a proposal from Tony Herring & Associates for the repair/replacement of the damaged flooring in the amount of $6,163.50.[4]

14.

Upon information and belief, the structural damage to Plaintiff's home was caused by pile driving, the use of heavy equipment and other activities of Journeyman during the construction of the Wal-Mart property.

---

[1]   See Structural Engineering Report prepared by Gilbert Engineering Services, LLC on behalf of Plaintiff on August 29, 2014, attached hereto as Exhibit "A."
[2]   Exhibit "A."
[3]   See ECO Builders estimate attached hereto as Exhibit "B."
[4]   See Tony Herring & Associates proposal, attached hereto as Exhibit "C."

15.

Since the construction of the Wal-Mart behind Plaintiff's home and because of the damages to the home, the current value of her home has dropped significantly to approximately $150,000. In addition, because of the position of the Wal-Mart directly behind her back yard, potential buyers have chosen not to buy the home. She is entitled to payment for her loss in the value of her home.[5]

16.

In addition, Plaintiff endured months of excessive noise and inconvenience, as well as harassment by employees or subcontractors of Journeyman, and did and continues to experience the inconvenience of not being able to use her back yard because of flooding issues as a result of the elevation of the Wal-Mart property directly behind her home.[6]

17.

Plaintiff has made numerous attempts to resolve this issue, all to no avail, including a formal letter to Journeyman.[7]

18.

Journeyman is liable unto Plaintiff for her injuries and resulting damages in the following non-exclusive particulars:

    a) Violation of La. C.C. art. 667; and

    b) any other violations to be proven at trial of this matter.

19.

Wal-Mart is liable unto Plaintiff for her injuries and resulting damages in the following non-exclusive particulars:

    a) Violation of La. C.C. art. 667; and

    b) any other violations to be proven at trial of this matter.

---

[5] See letter from Michael Baradell from Keller Williams Realty Services regarding the decline in the value of the home attached hereto as Exhibit "D."
[6] See photographs of dirt built up to the top of my client's fence, causing an overflow of water and drainage problems in her back yard.
[7] See February 9, 2015 correspondence to representative's of Journeyman attached hereto as Exhibit "E."

20.

By reason of the negligence or fault of defendants, as set forth above, Plaintiff has

sustained damages in the non-exclusive particulars:

a)   Physical damage to the structure of her home;

b)   Diminution in the value of her property;

c)   Flooding of her property, which did not previously occur;

d)   Past and future mental pain and anguish;

e)   Inconvenience and harassment;

e)   Costs, interest and attorney fees; and

f)   all damages revealed in discovery.

21.

Petitioner is entitled to and requests a trial by jury.

WHEREFORE, Plaintiff, Jessica L. Valderrama prays that Defendants, Journeyman

Construction, Inc. and Wal-Mart Stores, Inc. be served with a copy of this Petition and be duly

cited to appear and answer same; that there be a trial by jury; and after due proceedings are had,

there be judgment herein against the Defendants awarding Plaintiff such damages as are

reasonable, plus interest, all costs of these proceedings and all other relief being just and

equitable by this Court.

BY: _____

KRISTI U. LOUQUE
Louisiana State Bar Association No. 31845
K. Louque Law Firm, LLC
2895 Highway 190, Suite 239
Mandeville, Louisiana 70471
Telephone: 985-727-0791
Email: klouque@klouquelawfirm.com
Counsel for Plaintiff

A TRUE COPY
byClerk. 22nd Jud. Dist. Court
ST TAMMANY PARISH, LA.

**PLEASE SERVE:**

Journeyman Construction, Inc.
Through its Registered Agent
CT Corporation System
5615 Corporate Blvd., Ste. 400B
Baton Rouge, Louisiana 70808

Wal-Mart Stores, Inc.
Through its Registered Agent
CT Corporation System
5615 Corporate Blvd., Ste. 400B
Baton Rouge, Louisiana 70808

22nd JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. TAMMANY

STATE OF LOUISIANA

NO.:  2015-11294                                    DIVISION:  J

JESSICA L. VALDERRAMA

VERSUS

JOURNEYMAN CONSTRUCTION, INC. AND WAL-MART STORES, INC.

FILED: *April 7, 2015*                          _____
                                                         DEPUTY CLERK

## JURY ORDER

LET THERE BE trial by jury upon depositing into the registry of the Court the sum of

$_____ for each day the Court estimates the trial will last, the said deposit to be made on or

before the date of trial, prior to the commencement of the trial.

Covington, Louisiana this ____8th____ day of ____April____, 2015.


THE AMOUNT AND TIME FOR
FILING JURY COST BOND
WILL BE FIXED WHEN THE                    _____
CASE IS SET FOR TRIAL                               JUDGE

                                          TRUE COPY
                                          Dy.Clerk, 22nd Jud. Dist. Court
                                          ST. TAMMANY PARISH, LA.

FILED
2015 APR -7 P 12: 34
ST. TAMMANY PARISH

- 7 -

FAX FILED
3/30/15

21st JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. TAMMANY

STATE OF LOUISIANA

NO.:   2015-11294                                              DIVISION:   J

JESSICA L. VALDERRAMA

VERSUS

JOURNEYMAN CONSTRUCTION, INC. AND WAL-MART STORES, INC.

FILED _April 7, 2015_                          _S/VERONICA FELTS-FRECHOU_
                                                              DEPUTY CLERK

**REQUEST FOR NOTICE**

PURSUANT TO Articles 1913, 1914 and 1572 of the Louisiana Code of Civil Procedure,

plaintiff, Jessica L. Valderrama, hereby requests that she be given written notice of the date of

trial, as well as written notice of each rendition by the Court of any Judgment, and/or

Interlocutory Order entered in the above entitled and numbered case.

Respectfully submitted,

KRISTI U. LOUQUE
Louisiana State Bar Association No. 31845
K. Louque Law Firm, LLC
2895 Highway 190, Suite 239
Mandeville, Louisiana 70471
Telephone:  985-727-0791
Email:  klouque@klouquelawfirm.com
Counsel for Plaintiff

Dy/Clerk, 22nd Jud. Dist. Court
ST. TAMMANY PARISH, LA.

FAX FILED
3/30/15

- 8 -

2015-11294S

**STRUCTURAL ENGINEERING REPORT**

FILED  108 SUGAR MILL DRIVE
SLIDELL, LOUISIANA

APR 07 2015  14-108
AUGUST 29, 2014

MALISE PRIETO - CLERK
Deputy RONICA FELTS-FRECHOU

Prepared For
**JESSICA VALDERRAMA**

Prepared by
GILBERT ENGINEERING SERVICES, L. L. C.
2307 RIVER VISTA DRIVE
ALMA, ARKANSAS, 75921
(504) 656-0926



James G. Gilbert, P. E.
Louisiana Registration # 14417

EXHIBIT
*A*

**GILBERT ENGINEERING SERVICES, L.L.C.**
2307 River Vista Drive, Alma, AR 72921
(504) 656-0926

STRUCTURAL ENGINEERING REPORT
108 SUGAR MILL DRIVE
SLIDELL, LOUISIANA

INTRODUCTION

August 29, 2014 a visual inspection was made of the above property to determine if the adjacent construction project was causing structural or cosmetic damage to the property, to verify the structural integrity of the building, and to determine the need for and to recommend remedial work. The inspection included the readily accessible and visible portion of the foundation, the driveway, the exterior and interior of the house, the attic and the attached garage. The emphasis of the inspection was primarily cosmetic damage since significant structural damage due to construction vibrations or settlement is rare, see Appendices. The house faces the east. Directions used in the report are given as facing the building from the street.

This report is based on the information available at the time the report is prepared. Gilbert Engineering Services, L. L. C. reserves the right to modify the report if additional information becomes available. Portions of the information in the report were provided by Ms. Valderrama. Gilbert Engineering's policy is to accept information provided clients as accurate[1] unless the physical condition suggests otherwise, which was not the case in this instance.

The report is prepared for the exclusive use of the client and presents the results of the inspection and an overview of the condition of the property. The report remains the property of Gilbert Engineering Services, L. L. C. *The General Comments and Constraints Appendix includes the general scope and limitations of the inspection. The scope may change to sum extent depending upon the issues being investigated. It also includes a discussion of settlement in the Greater New Orleans area, remedial foundation work, typical structural problems. The appendix "The Influence of Vibrations on Residential Buildings" provides background information on vibration theory and how vibrations effect residential buildings.*

The term "relative elevations" is used in the report to describe the flatness of the foundation and is not associated with flood elevations or other elevations which describe the height of the foundation relative to sea level or other standard references. The term "structurally sound" means that the primary structural components appear capable of transmitting the applied live and dead loads to the soil without failure. The term "basically sound" means that there is damage to a portion of the load bearing members or that there is significant differential movement of the foundation, but that most of the primary structural components appear capable of transmitting the applied live and dead loads to the soil without failure.

PHYSICAL DESCRIPTION AND BACKGROUND INFORMATION

The subject is a brick veneer and frame house which is reported to be approximately 14 years old. The dining room at the rear was an addition. The building was furnished at the time of the inspection. Table 1 contains a summary of the primary physical characteristics of the property.

The house was purchased in 2010 or there about. After the house was purchased, it was renovated. The house was listed for sale in the spring. Prior to the listing, it was inspected by the listing agent and no significant signs of distress, such as cracking, were noted.

**GILBERT ENGINEERING SERVICES, L.L.C.**
2307 River Vista Drive, Alma, AR 72921
(504) 656-0926

As previously mentioned, the house faces the East. There is an open area behind the house which runs Northeast to Southwest, see Google Earth Photo in photo section. The distance from the corner of the house to the fence separating the two lots is approximately 65' as measured on Google Earth. There was a buried slab in the open space.

There is a WalMart under construction at the site. The buried slab was demolished and a drainage ditch excavated immediately adjacent to the fence, see photos. The fill material placed on the lot is approximately 6' to 8', or more above the ground level at 108 Sugar Mill Drive.

| TABLE I PHYSICAL DESCRIPTION | |
| --- | --- |
| Type Construction: | One story, brick veneer and frame house. |
| Age: | Reported to be 14 years old. |
| Sidewalks: | Concrete. |
| Driveway: | Concrete. |
| Porches: | Attached, covered front porch. |
| Car Storage: | Attached garage. |
| Foundation: | Main house is pier and beam system. Garage is reinforced concrete slab. |
| Exterior Walls: | Masonry, and siding. |
| Roof: | Seal tab shingle system. |
| Trim: | Wood. |
| Gutters: | Pre-finished metal. |
| Attic: | Accessible. |
| Framing: | Conventional. |
| Interior Walls: | Sheetrock. |
| Ceilings: | Sheetrock. |
| Flooring: | Carpet, laminate wood, tile. |

No plans or specifications for the construction were available. It is understood that the construction permit was issued by the city shortly after the first of the year. At the time of the inspection, the site was viewed from Carrollo Drive, see photos. The underground plumbing appeared to be in place and there was scaffolding along the West side of the building.

Upon return from a trip starting at the end of July 2014, Ms. Valderrama noticed cracking in the ceramic tile floors in the kitchen and center hall. These floors had been cleaned by Ms. Valderrama immediately prior to leaving on the trip and were not cracked at that time. These cracks and other signs of distress observed by the owner are listed in the attached box.

Ms. Valderrama's mother was in the house during the time most of the construction work was ongoing. This included the time that the slab was being demolished, the drainage ditch excavated and the fill material placed. She described the movement of the building during the demolition and filling processes to be severe and similar to the movement associated with earthquakes she had experienced in California.

wrote 8/28/14

July 30-31 georgia

- Noticed cracked tile in kitchen about 3 weeks before went to see troy ingram.

- Noticed cracked tile in Hallway infront of washer/dryer Aug 19 when mopping.
  - was Not there when I mopped before I left to go out of town.

- Cracking in ceiling spreading down.

- Sheet Rock nail around curtin rod noticed right before I went out of town in master Bath.

- Cracking in wall corner between wall - fire place noticed when I returned home

- Cracking in Beam from fire place to conecting wall Noticed when I returned home

INSPECTION DATA
Foundation:

Valderrama Notes of Sign of Distress

**GILBERT ENGINEERING SERVICES, L.L.C.**
2307 River Vista Drive, Alma, AR 72921
(504) 656-0926

The foundation is a pier and beam system which does not appear to be pile supported. Most construction in this area is not and does not need to be on pilings. The foundation and associated framing were inspected from the perimeter and crawl space of the building. Visibility of the framing members was significantly reduced by insulation installed between the floor joists. The visible portion of the foundation and framing consisted of portions of the piers, the sills, sub-flooring and floor joists. The visible portion of the foundation and framing appears in generally satisfactory condition.

The foundation for the garage is a reinforced concrete slab[2]. The slab appeared in satisfactory condition; however, visibility on the interior was restricted by stored materials.

Relative elevations[3] were taken to determine if differential settlement was a significant factor in the development of the signs of distress. The data is presented in the attached drawing, Sheet 1. The foundation is level within normal construction tolerances. The floor has a slight dishing pattern with the center being lower than the perimeter.

Exterior:
The exterior is in satisfactory condition with no significant structural defects observed. There is some cracking of the masonry, most of which is hairline. The vinyl trim at the front wall has moved outward.

Interior:
The interior appears in generally satisfactory condition with no significant structural defects observed; however, there are numerous signs of distress, which include but are not limited to:
1.  The cracking in the ceramic tile floors of the kitchen and center hall floor which were observed when Ms. Valderrama returned from her trip. These are shown in Sheet 1.
2.  Great room, cracking and nail pops at the front ceiling transition of the vaulted ceiling. Cracking at the upper right corner of the kitchen entry.
3.  Kitchen, wall cracks at the right side of the pantry closet.
4.  Cracking above the upper right corner of the rear window near the refrigerator.
5.  Hall bath, nail and screw heads visible at the ceiling above the entry and the tub area.
Some of the cracks had been previously repaired and have returned.

Attic:
The visible attic framing and roof sheathing appear sound, in satisfactory condition and properly braced. The framing joints appear sound and tight. No roof leaks were observed; however, a comprehensive examination for roof leaks was not a part of this inspection.

Yard, Sidewalks, Driveway and Garage:
The yard and exterior concrete are in satisfactory condition. There is minor cracking and settlement of the exterior concrete.

The attached garage appears sound; however, visibility was restricted by stored materials.


RECOMMENDATIONS AND CONCLUSIONS
1.  The residence appears structurally sound; however, there are numerous signs of distress,

14-108S 108 Sugar Mill Drive                                                          Page 4

**GILBERT ENGINEERING SERVICES, L.L.C.**
2307 River Vista Drive, Alma, AR 72921
(504) 656-0926

particularly on the interior.

2.  Based on the condition of the property prior to the start of construction, it appears more likely than not that construction vibrations associated with the adjacent construction project either caused the development of the new signs of distress or caused existing signs of distress to become larger. See the attached appendix.

3.  The foundation is level within normal construction tolerances and does not appear to be a significant factor in the development of the signs of distress.

4.  It is recommended that the existing signs of distress be monitored during the construction period. The finish materials should also be monitored for new signs of distress.

5.  Repairs should be made to the finish materials when the work is completed. Cracked materials should be replaced, not patched, as the cracks will probably come back if they are only patched.

6.  It is more likely than not that the ongoing construction and the signs of distress will make it difficult to market the house.

7.  Assessment on the overall market value of the house upon completion of the store, should be made by a Realtor and/or a Residential Appraiser.

Notes:

1.  While the information provide by clients tends to be accurate, it is not unusual for the client to misinterpret meaning or the significance of the facts. This type of issues can usually be worked by discussing the information with the client.

2.  For the most part, the reinforcing in a slab is not visible and it is assumed that the slab was reinforced since most residential slabs constructed during the past seventy first years or more have been reinforced.

3.  The relative elevations were taken with Ziplevel, a digital elevation measuring system, manufactured by Technidea Corp., or similar device.



1. The elevations shown are in inches, relative to the high point.
2. The total differential measured was 1.4".
3. The slope between the high and low points is 0.05' per foot or 1/2" in 10'.

| Relative Elevations |
| --- |
| 108 Sugar Mill Dr. Slidell, LA |
| Gilbert Engineering Services, LLC |
| 2307 River Vista Drive |
| Alma, AR 72921 |
| (504) 656-0926 |

14-108    8/29/14          Sheet 1 of 1

Gilbert Engineering Services LLC - 2307 River Vista Dr., Alma, AR



<< Construction Area

The subject is the house with the orange marker. The construction work is taking place in the large open area directly the rear fence of the house. At its closest point to the house. Note there is no drainage ditch shown adjacent to the fence. The slab which was demolished is cover by dirt in this photo. (Google Earth Photo)

14-108 108 Sugar Mill Dr.          Photo Page 1

Gilbert Engineering Services LLC - 2307 River Vista Dr., Alma, AR



Front View



Rear

14-108 108 Sugar Mill Dr.          Photo Page 2

Gilbert Engineering Services LLC - 2307 River Vista Dr., Alma, AR



Rear Yard - Note fill material higher than fence



Drainage Ditch Behind Fence at Time of Inspection

Gilbert Engineering Services LLC - 2307 River Vista Dr., Alma, AR



New Drainage Ditch Adjacent to Fence Shortly After Construction
(Photo by Owner)



Construction Site View from Corroilo Drive at the Time of the
Inspection

14-108 108 Sugar Mill Dr.          Photo Page 4

Gilbert Engineering Services LLC - 2307 River Vista Dr., Alma, AR



Crawl Space



Cracking in Masonry

14-108 108 Sugar Mill Dr.                    Photo Page 5

Gilbert Engineering Services LLC - 2307 River Vista Dr., Alma, AR



Loose Molding at Corner

Interior

14-108 108 Sugar Mill Dr.          Photo Page 6

Gilbert Engineering Services LLC - 2307 River Vista Dr., Alma, AR



Interior

Cracked Ceramic Tile

14-108 108 Sugar Mill Dr.          Photo Page 7

Gilbert Engineering Services LLC - 2307 River Vista Dr., Alma, AR



Nail Head Visible in Sheetrock Ceiling



Interior

14-108 108 Sugar Mill Dr.              Photo Page 8

Gilbert Engineering Services LLC - 2307 River Vista Dr., Alma, AR



Cracked Ceramic Tile



Sheetrock Cracking

14-108 108 Sugar Mill Dr.                    Photo Page 9

Gilbert Engineering Services LLC - 2307 River Vista Dr., Alma, AR



Garage



Roof Framing

APPENDIX
THE INFLUENCE OF VIBRATIONS ON RESIDENTIAL BUILDINGS

INTRODUCTION
Residential buildings can be damaged by vibrations through four mechanisms:
1.    Movement of the building due to air blasts or ground movement
2.    Settlement of foundations.
3.    Impact of projectiles.
4.    Permanent ground distortion produced by the vibrations.
The paper deals with the first two mechanisms since projectile impact and permanent ground distortion are not common in the New Orleans area.

When a building or the soil below the building are subjected to vibrations, the response of the building is determined by the characteristics of the building, environmental conditions, including soil conditions, and the characteristics of the vibration. The interaction of these factors is very complex and is a specialized field of study. For this reason, the text only touches on the basic fundamental associated with the vibration of soils and buildings. Since some understanding of vibrations is required to understand the mechanisms causing the damage to the building, a cursory review of simple vibrations is presented at the start of the text.

SIMPLE VIBRATION
The following is a brief summary of definitions and characteristics of simple vibration theory which is the basis for most vibration analyses.
- Vibration - Vibration is a motion that repeats at regular intervals of time.
- Period - The period (of vibration) is the time required to complete one cycle.
- Frequency - The frequency is the number of cycles in a given period of time, usually cycles per second, referred to as Hertz (Hz).
- Amplitude - The amplitude is the maximum displacement of the vibrating body from the midpoint or stationary point.
- Damping - Damping in structures, due to friction and other causes, resists motion imposed by dynamic loads.
- Resonance - Resonance is the condition of a vibrating system under a given load such that the amplitude of successive vibrations increases. Unless limited by damping or other changes, the amplitude at resonance become very large, in some instances sufficient to damage or destroy the structure.
- Natural Frequency - The natural frequency is the frequency at which resonance occurs. If a structure is pulled out of position and released, the structure will vibrate at a given frequency, disregarding any effect of damping. This is the natural frequency of the structure. At the natural frequency only very small forces or movements are required to significantly increase the amplitude of vibration. For example, when pushing a swing, only a very small force is required to increase the amplitude if the push is applied at the same frequency as the natural frequency of the swing and a person in the swing. An other example is the suspension of a coffee cup by several rubber bands joined together. If the hand

GILBERT ENGINEERING SERVICES, L. L. C.
119 Magnolia Drive - Belle Chasse, La 70037
(504) 656-0926

## STRUCTURAL ENGINEERING REPORT APPENDIX
## GENERAL COMMENTS AND CONSTRAINTS

**1.0    PURPOSE**

The appendix outlines the inspection scope process, the limitations of the structural engineering inspection and report, and provides background information to assist in the evaluation of the property. The inspection and report are designed to identify the more common structural problems found in building construction, to *explain possible causes of foundation variations and to provide the reader with an insight as to future settlement conditions based on typical settlement scenarios as outlined in this appendix.*

*The scope of the inspection and the report is limited. Buildings are complex structural systems with many concealed components. To accurately determine the cause of existing settlement conditions; to project future settlement; and to completely determine the structural integrity of the a typical building, requires extensive engineering examination, testing and analysis which are usually considered to be cost prohibitive for most residential inspections and are outside the scope of this inspection and report.*

```
● Verifying the structural integrity of the
  building assuming typical construction
  methods and compliance with the applicable
  building code;
● Determining if significant differential
  settlement has occurred;
● Determining if conditions exist which
  might result in additional significant
  settlement, assuming typical soil
  conditions and settlement scenarios; and
● Determining possible remedial action.
```
TABLE I
EMPHASIS OF THE INSPECTION

**2.0    SCOPE**

**2.1    Emphasis of Inspection:**

Foundation problems are the most common structural problem found in residential and light commercial construction in the New Orleans area. For this reason, the primary emphasis is on foundation and settlement related problems. Foundation problems are common in all parts of the United States. In the New Orleans area, problems are most often associated with settlement. Where as in other parts of the country, foundation problems are often associated with expansive clays and geological faults. Expansive clays do cause some problems in this area, but this is the exception rather than the rule. The inspection is limited to a visual inspection of the readily accessible portions of the building as outlined in the Inspection Procedure Section. The emphasis of the inspection is summarized in Table I.

**2.2    Structural Components:**

For the purpose of this report, the structural system is considered to consist of the primary load carrying parts of the building which transfer loads imposed on the building to the soil. These generally include the roof sheathing and framing, the exterior and load-bearing wall framing, and the foundation system and associated framing. Table II summarizes primary structural components.

The foundation system is the part of the structure which transmits the loads to the ground. A portion of the foundation is in contact with the ground. The most common types of foundations in the New Orleans area are pier and beam, reinforced concrete slabs, and raised foundations such as the older raised houses. Some buildings have combinations of two or more of these systems. Pilings may or may not be used as a part of any of these systems.

Non structural parts of the building, such as the shingles, brick veneer, wood trim and other finish materials are important parts of a building, but they are not major load carrying members. Signs of distress in these materials may be useful in the evaluation of the structural condition of the building. The description of signs of distress, particularly cracking of the masonry, may be included in the report for future reference. Other discrepancies, such as routed or damaged finish materials, which do not effect the structural integrity of the building may be mentioned in the report for the convenience of the client. They are not part of the formal inspection. Only repairs of finished materials required to protect structural members are normally recommended. Other repairs are at the discretion of the client.

Items such as patio covers, detached carports, storage buildings and other structures which are not part of the main building are excluded from the inspection. Information may be provided on these areas for the convenience of the client. However, this information is not to be interpreted as an inclusion of the item as part of the inspection unless specifically noted in the report.

**2.3    Design of Remedial Work:**

General recommendations for repairs required due to structural or settlement problems may be included as a part of the inspection and report. They are not intended for construction purposes without more detailed information. Cost estimates, detailed designs for remedial work, reinspection, construction inspections and certification of completion of the work are available as part of our services, but they are not included as part of the original scope of work unless specifically stated.

```
● Roof Sheathing
● Roof Rafters and Bracing
● Ceiling Joists
● Load-Bearing Walls
    o  Studs and Plates
    o  Some masonry walls
● Foundations and Associated Framing
    o  Reinforced Concrete Slabs
    o  Floor Joists
    o  Sills and Beams
    o  Piers
    o  Columns
    o  Footings
    o  Pilings
```
TABLE II
STRUCTURAL COMPONENTS AND SYSTEMS

GILBERT ENGINEERING SERVICES, L. L. C.
119 Magnolia Drive - Belle Chasse, La 70037
(504) 656-0926

3.0    SETTLEMENT
3.1    Background:
     Settlement consists of the downward movement of the foundation caused by
changes in subsurface conditions. Upheaval or upward movement caused by the expansion of
soil is also included as part of the settlement phenomenon in this discussion. For the purpose
of this report, settlement is considered to be caused by or to consist of:



FIGURE 1
TYPICAL SETTLEMENT SCENARIO

    o    Primary settlement cycles;
    o    Secondary settlement or long term consolidation;
    o    Decay of organic materials; and
    o    Movement due to the consolidation or expansion of soils
        brought on by changes in the moisture content of the soil.

     Settlement is a complex phenomenon and a function of many factors, including such
factors as the type of soil below the foundation (including the chemical composition, organic
content, and grain size and shape); soil preparation during construction; the foundation design;
the depth of the water table; the moisture content of the soil; and near by construction.
Accurate measurements over an extended period of time as well as detailed soil data are
required to determine if the settlement has stopped for all practical purposes or reached an
acceptable rate.

     In most instances, it is possible to assume from the age of the property, typical settlement scenarios and the general history of the neighborhood
around the property, whether or not significant settlement should be expected in the future. *However, because of the complexities involved, there is always
the risk that the actual future conditions may vary dramatically from those assumed.* In some instances, it is not possible to make such assumptions and
more accurate measurements over an extended period of time may be recommended.

3.2    Differential Settlement:
     Most foundations in the New Orleans area experience settlement. Ideally, the amount is small and the foundation settles uniformly at an acceptable
rate. The primary concern in residential and light commercial construction is usually differential settlement where the foundation does not settle uniformly.
Differential settlement can be caused by several factors including but not limited to, load distribution in the building, the foundation design and soil
distribution below the foundation. Differential settlement occurs in both pile supported foundations and those without pilings.

     Excessive settlement, particularly differential settlement, is considered to be a structural failure since a primary design criteria is that the
foundation transmit the loads to the soil without excessive settlement. Excessive settlement or differential settlement is considered as evidence that the
foundation is not or was not capable of properly transmitting the applied loads to the soil. Unlike most structural failures, the foundation usually becomes
stable at some point in time and is then capable of transmitting the applied loads to the soil with little additional settlement. For this reason, the settlement of
the foundation is addressed as a separate topic from other structural problems in the engineering report.

     If the foundation design exceeds the safe load capacity of the soil, then the settlement scenario may vary dramatically from the typical scenario
discussed here. In these instances, stabilization of the foundation may not occur until significant damage to structural components has occurred or the
functional use of the building is significantly jeopardized.

3.3    Primary Settlement:
     The majority of the settlement is assumed to result from primary settlement. Primary settlement normally takes place during the early life of the
structure and the settlement rate reaches an acceptable level after 4 or 5 years. At this point, the foundation is usually capable of carrying the imposed loads
with little additional settlement.

     Studies of soils in the New Orleans area show that while there is a wide range of soil conditions and anticipated settlement, 50 to 70% of the
settlement takes place within the first year after the soil is loaded, 70 to 85% within the first 2 years and 85 to 95% within 5 years, see Figure 1. The time
required for the settlement cycle may be longer and the amount of settlement higher in poorer soils such as abandoned distributories and undrained land. Even
in these cases, the majority of the primary settlement is expected during the first five years after the beginning of the settlement cycle.

     Additional primary settlement cycles can be initiated by changes in the loads on the soil (i.e. construction of additions) and by changes in
subsurface conditions, particularly significant lowering of the water table since the moisture content of the soil is an important factor in the strength of the
soil and settlement. The water table usually drops after a subdivision is developed because of higher runoff and improved drainage. After a few years, the
water table stabilizes at a lower level and remains at this level until other subsurface changes occur. One of the most common causes of subsurface changes
is improvement of the drainage system.

3.4    Secondary Settlement:
     Secondary consolidation or settlement is assumed to begin near the end of the primary settlement cycle. It is thought to result from the compression
of soil particles at a microscopic or molecular scale. It is particularly common in organic soils as exist throughout the New Orleans area and South Louisiana.

GILBERT ENGINEERING SERVICES, L. L. C.
119 Magnolia Drive - Belle Chasse, La 70037
(504) 656-0926

Secondary settlement normally occurs at a lower rate than primary settlement and does not become a significant factor in the total differential of most foundations until the homes are relatively old.

3.5    Decay of Organic Materials:
The decay of organic particles in the soil is a major factor in total settlement of residential foundations in the New Orleans area. A large portion of the land used for residential construction in the area is reclaimed swamps and marshes with soils which have a high organic content. As the organic material decays, the soil consolidates, resulting in additional settlement. The lowering of the water table usually speeds up the decaying process.

3.6    Changes in Moisture Content:
The strength of the soil and the amount of settlement will vary with the moisture content. The strength of the soil increase as the moisture content increases. Once the moisture content reaches the optimum point, the strength of the soil decreases, in some instance dramatically.

The moisture content of the soil may vary due to extended periods of wet and dry weather or prolonged changes in the water height of the river, if the property is near the river. Changes in the moisture content can cause compaction and settlement and, in some instances, expansion of the soils. The change in the moisture content appears to occur most often in homes which are not on pilings. The most common effect is for older homes to begin to experience additional settlement after it appears that the foundation has stabilized and the settlement reached an acceptable level. This condition occurs through out the New Orleans area, particularly after extended periods of dry weather. The condition occurs most often in homes which have already experienced some differential settlement. However, instances are documented where movement has occurred where the foundation has experienced only small amounts of differential settlement.

In some instances, the amount of differential settlement may decrease due to expansion of the soil. These conditions are most likely to occur in homes which are not supported by pilings, particularly when the soil has a high clay content. During periods of dry weather, the soil around the foundation should be watered sufficiently to prevent cracking of the soil or cracks developing between the foundation and the soil.

Excessive amounts of water can be as damaging or more damaging than lack of moisture. Excessive water can greatly reduce the load carrying capacity of the soil and in some instances, reduce the load carrying capability of piles. The yard around the building should be graded to provide proper drainage of water away from the foundation. Water should not be allowed to run or stand under a foundation.

3.7    Trees and Plants:
The effect of plants, particularly large tree near foundations is not fully understood. It appears that in most instances trees pose no real threat to foundation stability other than that normally associated with plants and shrubs. Typical ways in which trees near a building can effect the foundation and/or exterior concrete around the building are summarized in Table III.

Excluding changes in the water table, the decreases in the moisture content of the soil near the surface is caused by either evaporation or the removal of water from the soil by vegetation (transpiration), particularly trees. In many instances, the loss of water due to trees and shrubs may exceed the loss by evaporation. The extent to which this loss effects foundations has not been clearly demonstrated.

- The root system can reduce the moisture content of the soil, particularly during periods of dry weather.
- The system of roots reinforce the soil and can help prevent settlement.
- The roots can displace the concrete, particularly sidewalks and driveways.

TABLE III
TYPICAL WAYS IN WHICH TREES CAN EFFECT FOUNDATIONS

The water used by trees and shrubs is absorbed by the root hairs near the ends of the roots that are near the surface. The roots are generally assumed to extend to near or slightly beyond the furthermost extension of the limbs. The majority of the moisture absorbed by the roots is absorbed by the outer portion of the root system. The loss of moisture does not tend to effect the foundation if the moisture taken from the soil can be easily replaced or unless the tree is very close to the foundation.

The roots of trees which grow near a building after the foundation is constructed do not normally extend under the slab if the outer grade beams are 2' or more deep. This is because the roots which absorb the moisture grow near the surface. If a foundation is built over a tree root system, the roots will continue to draw water from under the foundation. Any negative effect of the reduction in moisture level of the soil maybe off set by the matting effect or reinforcement of the soil caused by the root system. In addition, the shade of the tree often reduces the loss of moisture from the soil due to evaporation.

During dry weather, the soil around the foundation and particularly around trees and shrubs should be watered sufficiently to prevent the soil from drying out and cracking. In addition, trees should not normally be planted closer to a foundation than the anticipated height of the tree when grown. Trees considered to have high water demands are mature oaks, elms and willows with trunk diameters of 3' or more.

3.8    Other Factors:
Settlement may also be caused or increased by other factors such as the type and amount of fill; deterioration of pilings; nearby construction, such as excavations associated with the installation of sanitary or storm sewer improvements; problems associated with broken or leaking water mains and sewer systems; and vibrations from nearby traffic.

**GILBERT ENGINEERING SERVICES, L. L. C.**
*119 Magnolia Drive - Belle Chasse, La 70037*
(504) 656-0926

**4.0    MEASUREMENT OF SETTLEMENT**
**4.1    Relative Elevations:**

For the purpose of this report, differential settlement is measured using the relative elevations of the foundation. This method ignores total settlement of the foundation. A reference point on the foundation is selected and the height of other points are given relative to the reference. Unless otherwise noted, the low point is selected as the reference (i.e. the elevation of the low point is set equal to 0") and the other elevations shown as positive numbers. See Figure 2. Characteristics of relative elevations are summarized in Table IV.

- Relative elevations show the height of the foundation relative to a specific point on the foundation, usually the relative elevation indicates the height above the low point.
- Relative elevations are usually taken inside the house with a a digital elevation measuring system, or similar devise.
- Relative elevations are accurate to ± 0.25" but the repeatability may be more than this.

TABLE IV
CHARACTERISTICS OF RELATIVE ELEVATIONS

Negative numbers are usually used to show relative elevations in engineering work; however, they are shown as positive numbers in these reports since most nontechnical readers prefer this method. Negative numbers are sometimes used to facilitate comparison of previous data with recent data or in instances where it may be desirable to show points lower than the reference point, such as recessed slabs. Negative numbers are indicated either by a minus sign or by placing the number in parenthesis.

Relative elevations are included to give an indication of differential settlement. They are taken on the finished floor surfaces with a water level or similar devised and corrected for temperature changes and variations in the thickness of floor finishes to the extent practicable, unless otherwise noted in the report. The measurements are assumed to be accurate to plus or minus 1/4". The repeatability may not be this accurate due to factors including, but not limited to, wear of floor finishes, foreign materials below floor finishes and normal variations expected in field measurements. The differential between the high point and the low point is verified after all other readings have been taken.

Typical construction variations are in the range of ± 0.5" to ± 0.75"; however, it is not normally known where the variations occurred. For this reason, variations due to construction are ignored unless specific information of the flatness of the foundation immediately after construction is available.

Relative elevations may be taken on the exterior by measuring the relative elevation of the brick ledge. Variations of 1" or more between relative elevations taken in this manner and those taken inside the home are not unusual. The difference between the two is usually due to the way in which the foundation and walls are constructed.

**4.2    Slopes:**

The size of the foundation and the distance between the high and low points should be considered in evaluating differential settlement. The slope is usually included in the report to facilitate the evaluation. Unless otherwise noted, the slope is the average slope calculated by dividing the total differential by the distance between the high and low points. If there are multiple highs and/or lows, the slope is usually measured between the closest high and low. Other slopes may be included if the slopes vary significantly throughout the building.

The slope is expressed in inches per foot. This is the vertical distance of the foundation changes in one foot. Since this is a small number which is hard to visualize, the slope is also expressed in inches per ten feet.

The slope of the foundation is useful in comparison of the differential settlement of large and small foundations, but should be used with discretion. The slope can be significantly affected by relatively small changes in relative elevations and distances. This is particularly true when the distance between the high and low points is short and/or the variations in relative elevations are small.

**4.3    Other Causes Of Variations In Relative Elevations:**

Variations due to causes other than differential settlement are not unusual. They may be due to construction methods, including variations in tolerances for construction materials, and deflections due to live and dead loads. It is often difficult to distinguish these variations from those caused by settlement.

There are no uniformly accepted tolerances for how level a residential foundation should be constructed. Plus or minus 1/2" (1" total variation) is a commonly accepted tolerance for commercial construction based on various technical specifications. Variations larger than this are the rule, not the exception, for residential construction, particularly for foundations constructed at two or more levels or which have unusual shapes. Pier and beam foundations may vary more than slabs due to the larger number of items in the construction which effect finished floor elevation, (i.e spread footings, piers, sills, floor joists, and subfloors.)

All foundations are flexible to some extent and the foundation may deflect due to normal live and dead loads. Under the American Concrete Institute Building Code, deflections due to live loads of up to 1/2" in 10' are allowed under certain conditions. Similar or larger deflections for pier and beam foundations are allowed under most building codes for certain conditions.



FIGURE 2
RELATIVE ELEVATIONS

GILBERT ENGINEERING SERVICES, L. L. C.
119 Magnolia Drive - Belle Chasse, La 70037
(504) 656-0926

4.4     Comparative Data:
         The report may include percentages comparing the inspected foundation with others in the New Orleans area. The comparisons are based on analyses of data obtained by Gilbert Engineering during structural inspections. The information should be used only as a general indication of how the foundation compares to others in the area. The percentages are based on total variations and do not reflect any consideration as to the size of the foundations. The average slope is usually included in the report, which can be compared to the average in the New Orleans area. However, as discussed previously, this should be done with discretion since the slopes can be misleading in some instances.

         Copies of the report on Differential Settlement in the New Orleans area are available upon request. The report shows the average and median differential by geographic areas, percentage distribution of differentials and average slope.

5.0     CRACKED SLABS
         Most concern about a "cracked slab" is unfounded. A characteristic of concrete is that it cracks. One of the purposes of the reinforcing in a slab is to control the number and size of the cracks. For this reason, post tension reinforcing is often used in residential and light commercial slabs because the process tends to minimize visible cracks in the slab.

         The primary cause of concrete cracking is thermal stresses generated during the chemical reactions which occur during the curing of the concrete. During the life of the slab, cracking may occur for a number of reasons, including differential settlement. As a foundation settles and/or goes through heating and cooling cycles, the existing cracks tend to grow and more cracks become visible. As a general rule, these cracks do not significantly affect the load carrying capability of a properly reinforced concrete foundation and repairs are not required for structural reasons.

         Almost all reinforced concrete residential and light commercial slabs have visible cracking, particularly common are cracks in the surface or sides and at the corners. These conditions are common and do not usually effect the structural capacity of the foundation or present problems with allowing water or insects into the building. However, instances of termites and water entering a building through cracks do occur and it is prudent to seal cracks when finished floor materials are being replaced. This can be easily done with an epoxy patching material.

         It is not uncommon for cracks in the slab to penetrate floor finishes such as ceramic tile or brick pavers, particularly if the finish floor material is bonded directly to the slab. Installation on a thick bed of mortar will usually reduce the amount of visible cracking.

6.0     REMEDIAL FOUNDATION WORK
6.1     Remedial Work Considerations:
         This section summarizes considerations in determining whether remedial foundation work is required or desirable. Remedial methods are discussed briefly. A comprehensive discussion of remedial foundation work is outside the scope of this report. More detailed information on remedial foundation work is available upon request. Engineering design and inspection services are available if desired.

         Remedial foundation work for residential and light commercial foundations usually consists of underpinning the foundation. The work may or may not include leveling of the foundation. Underpinning consists of installing additional support below the existing foundation.

         The process in determining whether or not to undertake remedial foundation work due to settlement is complex since the decision involves technical, economic, marketing and emotional considerations. The technical considerations which are addressed in the engineering report are summarized in Table V. When the answers to these questions are favorable, leveling and remedial foundation work is not required for structural reasons. This is the case with most homes inspected, including those with relatively high differentials.

         This does not mean that remedial foundation work not may be desirable or required for nontechnical reasons such as financial, marketing, or aesthetical considerations. Most remedial foundation work is done for these reasons rather than technical reasons. The decision based on nontechnical reasons is outside the scope of the engineering inspection and report.

         The cost and difficulty will vary from foundation to foundation. As a result, there is one rule which should not be ignored casually when consideration is being given to purchasing residential or light commercial properties which have a high amount of differential settlement. That is simply:

         *If the building is to be purchased with the intent to perform remedial foundation work or leveling, an estimate of the cost of the remedial work should be obtained from one or more qualified contractors.*

6.2     Pier and Beam Systems:
         Pier and beam foundations are usually relatively inexpensive to repair and level. The work consists of jacking the house and providing proper support using the existing piers and sills. Additional sills and piers may be required. The cost will be affected, often dramatically, by such factors as brick walls, the size of the building, chainwalls, the number of stories and the need for pier or sill repairs.

- Future Settlement – Has the settlement of the foundation stopped or reached an acceptable level? Is additional settlement likely or probable?
- Structural Damage – Has the settlement done, or is additional settlement likely to do, any significant damage to the structural members of the building?
- Functional Use – Has the differential settlement affected the property sufficiently that it is not suitable for its intended use?

TABLE V
TECHNICAL CONSIDERATIONS
IN REMEDIAL FOUNDATION DECISIONS

GILBERT ENGINEERING SERVICES, L. L. C.
119 Magnolia Drive - Belle Chasse, La 70037
(504) 656-0926

6.3     Reinforced Concrete Slab Not On Piles:
Remedial work on reinforced slabs not on pilings will normally consist of underpinning and/or leveling of the slab. Until recently, most underpinning of slabs not on piles was done using poured concrete piles and caps. This method is still widely used throughout the New Orleans area and works effectively in some conditions. However, it is difficult to predict the extent of any future settlement using this method.

The jacking of segmented piles under the existing foundation has recently become cost effective. This method has the advantages that the loads on the piles are known and much longer piles can be installed. This not only improves the design considerations, but reduces the possibility of future settlement.

Screw jacks or helical anchors have also been used successfully in the area to underpin foundations. This method is discussed below.

A common practice is to underpin only a portion of the slab to reduce the cost. This approach may result in a higher probability of additional settlement due to considerations which are outside the scope of this report. With any method, the best approach to minimize future differential settlement is to underpin the majority, if not all, of the foundation. Unfortunately, this may become cost prohibitive.

The cost of remedial work will depend upon factors such as:
1.      The number and location of the additional footings;
2.      The location of adjacent improvements such as carports/garages/driveways, the size of the foundation; and
3.      The extent to which it is desired to level the house.

6.4     Reinforced Concrete Slabs On Piles:
Remedial work on reinforced slabs on pilings is complex and expensive, almost without exception. For this reason, until recently, it has been considered economically unfeasible to level foundations on piles. In many instances, this is the case.

Typical remedial work consists of excavating under the existing foundation to expose the main support beams, installing additional piles under the existing foundation and/or extending and jacking the existing piles; construction of a reinforced concrete strip footing supported by the new and/or existing piles; jacking the foundation to the desired position; and installing piers or a chainwall between the new and old foundations and backfilling around the building.

There are numerous variations to the above approach, including omitting of the jacking and leveling process if the foundation is only under pinned. Other variations include the use of screw piles or helical anchors discussed below.

6.5     Other Systems:
Recently a system where the moisture content of the soil is controlled has been developed and may be effective in certain soils. However, there is still considerable debate in technical circles as to the effectiveness of this method. After soil samples indicate that the system is applicable to the existing soil conditions, a water injection system is installed which maintains the moisture content of the soil within the desired range. While this system may result in some leveling, it should be considered for stabilization purposes only.

In some soils, screw type piles or helical anchors can be used. Segmented helical anchors are screwed into the ground until a known resistance is achieved. This resistance is used to determine the load capacity of the pile. Whether or not they are cost effective to use will depend upon the specific conditions at the site. In many instances, screw piles or anchors can be installed much easier and quicker than conventional underpinning devices, particularly if the foundation is not on pilings.

6.6     Recommendations If Remedial Work Is Undertaken:
The condition of the property should be documented before and after the foundation work is performed. As a minimum, the factors listed in Table VII should be given serious consideration before remedial work is undertaken. However, it should be remember that *the most common mistake made by homeowners undertaking remedial foundation work is the failure to consult an engineer before the work is undertaken. Even if an engineering inspection has been made, the proposed methods should be reviewed and approved by a Civil Engineer or Architect. In some parishes, this must be done to obtain a building permit.*

7.0     LIMITATIONS
The inspection is performed and the report written for the exclusive use of the client. All others are cautioned that other information which may be significant in the evaluation of the property may have been provided separately from this report.

- The design and inspection criteria of HUD or any financial institution which might be used for financing the property should be determined. Supervision and inspection of the remedial foundation by an engineer may be required to obtain financing.
- The qualifications of the contractor should be determined.
- The design should be reviewed and approved by a registered Civil Engineer or Architect who has is knowledgeable in foundation repairs.
- Prior to the start of work, the extent of leveling, if any, should be discussed and understood as it is often not possible or desirable to completely level a foundation.
- Relative elevations should be taken before and upon completion of the work.
- The work should be inspected in progress by the Engineer or Architect.

TABLE VI
RECOMMENDED MINIMUM CONSIDERATIONS FOR REMEDIAL FOUNDATION WORK

The report reflects Gilbert Engineering's professional opinion of the condition of the property at the time of the inspection based on a visual

GILBERT ENGINEERING SERVICES, L. L. C.
119 Magnolia Drive - Belle Chasse, La 70037
(504) 656-0926

inspection of the readily accessible portions of the property. *It is assumed that the building, including concealed components and systems, has been constructed and/or modified in accordance with the applicable building code at the time of construction. The inspection is not made for compliance with the present building code; however code violations may be mentioned in describing the condition of the property, particularly framing problems. No warranty is given or implied.*

Unless specifically noted:
1.   No soil testing and analysis has been performed;
2.   Concealed components and systems are assumed to be in satisfactory condition;
3.   No engineering measurements have been made other than relative elevations; and
4.   No stress or loads analysis have been made.

The client is cautioned that extensive and comprehensive engineering examinations such as the above items are required to fully evaluate the structural condition of the property. As a result, the possibility exists that some unforeseen or concealed conditions may exist or occur, such as changes in subsurface conditions or hidden structural defects, which could significantly effect assumed or future condition of the building. For this reason, it is a good practice for existing conditions, such as cracks, to be monitored on a regular basis over an extended period of time.

Space and time does not permit a comprehensive discussion of all conditions which might exist. If any additional information is desired, the engineer is available for discussion with the interested party. However, the discussions will be limited to an explanation of technical considerations. Extensive discussions and more in depth examinations and analysis may require additional fees.

Any sketches and layouts in this report are included to facilitate understanding of the results of the inspection. While they are generally correct and are based on field measurements, they may vary from actual conditions, particularly as to door locations and room sizes.

## 8.0    INSPECTION PROCESS

8.1    Reinforced Concrete Slabs:
The visible portion of reinforced concrete slabs are inspected for significant structural defects and cracks. The visible portion normally consists of the side of the slab and other exposed surfaces. Visibility of all or a portion the exterior surface is often blocked by such items as shrubs and flower beds. Relative elevations are usually taken to determine the extent to which the slab is out of level.

8.2    Pier and Beam Foundations:
The visible portion of the foundation is inspected for signs of structural defects and signs of settlement. This includes the inspection of piers, chainwalls, columns, sills, joists and subflooring, if readily accessible. Unless special arrangements are made, the inspection is normally performed from the exterior of the building unless there is a crawl space in excess of 36" between the ground and the lowest portion of the floor system. Inspections are often limited or blocked by shrubs, flower beds, and excess moisture under the building. In addition, many home owners install access covers or plastic (visqueen) over openings in chainwalls and between exterior piers. These are not removed unless they can be easily removed by hand and not damaged in the process. Relative elevations, as described previously, are taken to determine the extent to which the foundation is out of level.

8.3    Pilings:
Unless the pilings are readily visible, no determination is made as to whether or not the foundation is on pilings. If information on pilings is available, or if predominate construction practices in the area indicate that the foundation may or may not be on pilings, this information is included in the report.

8.4    Exterior:
Exterior walls are inspected from ground level for significant signs of structural defects and cracking. Access to exterior walls are often limited by flower beds, shrubs, stored materials and other exterior materials. Roofs are inspected visually from the ground unless previous arrangements have been made. The roof is inspected solely for indications of structural defects. No inspection for water tightness is made or should be implied unless specifically stated in the report.

8.5    Interior:
Interior walls, ceilings and floors are inspected for significant signs of structural defects, cracking or indications of concealed structural defects. Access is often limited by furniture and stored materials.

8.6    Attics:
The attics are inspected for signs of water damage to structural members, installation of normal bracing, and tightness of framing joints. Inspections are limited by head space (3' minimum required), stored materials, and difficulty in entering the attic. The attic should be readily accessible by folding stairs, access doors or panels without removing such items as stored material, closet shelves, etc. Access panels should be accessible from the next to top step of a six foot step ladder. The purpose of the inspection is to identify significant structural defects or problems, as a result, minor damage to framing and or roof decking may not be mentioned in the report.

8.7    Garages and Other Improvements:
Garages, carports, storage buildings, swimming pools, patios, sidewalks and porches us well us other non living areas are inspected as a courtesy to the client and are not considered to be a portion of the inspection unless they effect the structural integrity of the main building or contribute to foundation

GILBERT ENGINEERING SERVICES, L. L. C.
119 Magnolia Drive - Belle Chasse, La 70037
(504) 656-0926

and/or settlement problems. To the extent practical and to which time allows, they are visually inspected and the information provided in the report.

8.8   Termite Damage:

Louisiana laws require that inspections for wood destroying insects be made by individuals licensed by the state and an inspection for termites or other wood destroying insects is not a part of this inspection. The building is inspected for significant damage to structural components by wood destroying insects and/or water. The inspection is limited to readily accessible areas. Finished materials are not removed unless special arrangements have been made. Concealed damage may cause signs of distress in the finished materials but this is not always the case, particularly if the building has been refinished or renovated. Concealed damage can only be confirmed by exposing the concealed structural members.

If live termites or termite tunnels are observed, they are generally mentioned in the report and a termite inspection is recommended. If termites and/or termite damage is observed during the termite inspection, the financial institution will normally ask for these area to be inspected to verify that there is no structural damage. Since the termite inspection will identify even minor damage, there is a reasonable possibility that termite damage will be identified during the termite inspection that was not observed and/or mentioned in the structural engineering report. Furthermore, since termite inspections are normally required to be completed within 30 days of "Act of Sale", it is not unusual for the request for verification of no structural damage at all points mentioned in the termite certificate to come during the last few days before the "Act of Sale". For this reason, the termite inspection report should be reviewed by the client as soon as possible.

8.9   Age:

Unless specific information is provide by the client prior to the inspection, the age of the property included in the report is an estimate based on the appearance and location of the property. It is used for statistical analysis purposes only.

E.C.O. Builders, Inc.
900 Old Spanish Trail
Slidell LA 70458
P.O. Box 5741 Slidell, LA 70469
Sli. (985) 645-9558 Cov. (985) 626-3803
NO (504) 254-2116 Fax (985) 645-9164

Proposal Submitted To:

    Jessica Valderrama
    108 Sugar Mill Dr
    Slidell LA 70458

Proposal No. 13681 (revised)

Sheet No. 1 of 2        2015-11294 J

Date: October 30, 2014        FILED

Work to be Performed at:        APR 07 2015

Same        MALISE PRIETO - CLERK
        Deputy/VERONICA FELTS-FRECHOU

Phone:  (985) 290-3387    Cell
Email:    valderrama_jessica@yahoo.com

We hereby propose to furnish all the materials and perform all the labor necessary
to repair the home as outlined.

Leveling (pier & beam):
- Approximately 64 linear feet of sleeper sills will be installed (sleeper sill consist of a 24" x 24" concrete pad installed on level ground with 8" x 8" x 16" concrete blocks installed on top and mortared. A termite shield capps the blocks then a 6" x 6" x 16' treated timber completes the sill)
- New sill includes approximately 10 new heavy duty concrete block piers
- Heavy duty concrete block piers will be added between existing piers as needed
- Existing piers will be straightened and / or replaced as necessary
- Once sleeper sills are installed the home will be leveled as close as possible to its original horizontal position
- The home will be secured at its best achievable position if E.C.O. Builders, Inc. determines leveling is not achievable and/or may cause damage to the home
- Once the job is complete all debris will be removed
Notes:
- Left side and front of home cannot be adjusted due to brick & garage.
- Removal or replacement of rotten wood is not included.
- Owner is responsible for removing any and all interior and exterior items that may be damaged during leveling.
- We cannot be held responsible for any interior, exterior, structural, cosmetic, plumbing, electrical, HVAC. and / or landscaping damage due to leveling.
               ***Pier & Beam Leveling has a Lifetime Non-transferable Warranty***

         If you have any questions, please call me at (985) 502-9558. Thanks, Elwin

All material is guaranteed to be as specified, and the above work to be performed in accordance with the drawings and specifications
submitted for above work and completed in a substantial workmanlike manner for the sum of

Ten thousand eight hundred and 00/100*******************************************************Dollars ($10,800.00)        **EXHIBIT
        B**

Additional cost below are above and beyond proposal price:

Interior & Exterior Damage        $8,000.00 - budget
- The above price represents the exterior and interior damage that may be caused during the leveling process from our experience (apprx. 40 years). The amount cannot be an exact amount until the work is performed. This is a budget only.

Payments to be made as follows:
20% (non-refundable) deposit upon acceptance of proposal, 30% required when work is started, a payment of 25% at 50% completion of the job, a payment of 15% at 75% completion, balance due upon substantial completion of job.

E.C.O. Builders, Inc.
900 Old Spanish Trail
Slidell, LA 70458
P.O. Box 5741 Slidell, LA 70469
Sli. (985) 645-9558 Cov. (985) 626-3803
NO (504) 254-2116 Fax (985) 645-9164

Proposal No. 13681 (revised)

Sheet No. 2 of 2

Date: October 30, 2014

Proposal Submitted To:

    Jessica Valderrama
    108 Sugar Mill Dr
    Slidell, LA 70458

Work to be Performed at:

Same

Phone:  (985) 290-3387   Cell
Email:    valderrama_jessica@yahoo.com

Any alteration or deviation from above specifications involving extra costs, will be executed only upon written orders, and will become an extra charge over and above the estimate. Price does not include any unforeseen items of work which are not evident at the time of inspection and may be uncovered during the course of the job. All agreements are contingent upon accidents or delays beyond our control. Owner is to carry fire, tornado and other necessary insurance upon above work. Workmen's Compensation and General Liability Insurance on above work to be taken out by E.C.O. Builders, inc. 2% per month will be added on any unpaid balance. Attorney fees of 33% plus court costs will be added to balance due once placed for collection. It is understood that this proposal sets forth our entire agreement and upon acceptance will become a legal and binding contract. All disputes arising from the issuance of this proposal and any subsequent contracts related thereto shall be submitted to binding arbitration in St. Tammany Parish, Louisiana, all in accordance with the rules and regulations of the American Arbitration Association or any other entity that provides for arbitration of disputes. Any and all verbal agreements are non-binding.

          Respectfully submitted:  E.C.O. Builders, Inc.
          Per Elwin C. Ordoyne, III V.P.

          Note: This proposal may be withdrawn by us if not accepted within 30 days.

ACCEPTANCE OF PROPOSAL

The above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payment will be made as outlined above.

Print _____    Signature _____

Date _____    Signature _____

FILED
2015-11-294
APR 1 2015

MALISE PRIETO - CLERK
CS/VERONICA FELTS-FRECHOU

# Proposal

**Tony Herring & Associates**
WHOLESALE FLOORING
211 W. Camellia Drive
Slidell, Louisiana 70458
Telephone: (985) 641-0590  (504) 525-8464

Page No. 1 of 1 Pages

## PROPOSAL SUBMITTED TO:

| | |
|---|---|
| Name: Jessica Valderrama | Phone: |
| | Date: 11/11/14 |
| Street: | Job Name: |
| City, State, Zip: | Job Location: 108 Sugar Mill Drive |
| Architect: | City, State, Zip: Slidell, LA 70458 |
| Date of Plan: | Job Phone: |

We hereby submit specifications and estimates for:

Tile Cracking in Several Areas - All Tile is Same in House (Porcelain Tile w/ Hardibacker (Raised House)
Kitchen, Foyer, Utility, Hall, Baths, Fireplace

| | |
|---|---|
| Pull Up Tile & Hardibacker  - 390ft x $3.75/ft | $1,462.50 |
| Furnish & Install Porcelain Tile and Hardibacker in above areas  - 390ft x $8.90/ft | $3,471.00 |
| Remove & Replace Shoe Molding in above areas | $ 495.00 |
| Remove & Replace Backsplash (Same as floor tiles) | $ 670.00 |
| Remove and Reset Toliet | $ 65.00 |

**WE PROPOSE** hereby to furnish material and labor — complete in accordance with above specifications, for the sum of:

Six Thousand One Hundred Sixty-three and 50/100   dollars ($ 6,163.50).
Payment to be made as follows:

**READ BEFORE SIGNING:** All work will be completed in a workmanlike manner according to standard practices  Buyer understands that there may be a dye-lot variation from sample. Seller is not responsible for chips, dents, or conditions of existing moldings, doors, jams or fixtures.  Room must he clear of obstacles at time of installation. Seller is not responsible for cutting doors. Seller does not furnish or install shoe moldings or quarter rounds. Seller is not responsible for Buyer's measurements. Seller is not responsible for manufacturer or shipper delays. All agreements contingent upon strikes, accidents or delays beyond Seller's control. Buyer has read, understands and agrees to "About Our Installations" on the reverse side of this Contract. Buyer to carry fire, tornado and other necessary insurance. Our workers are fully covered by Workers' Compensation Insurance. Any alteration or deviation from the above specifications may result in an extra charge over and above the estimate. A FINANCE CHARGE will be charged to accounts past 30 days. In the event Buyer defaults under the terms of this agreement, Buyer agrees to pay reasonable costs and expenses incurred in the collection of same including all attorney fees, if the sums due are collected by or through an attorney.

This is a valid binding Contract not subject to cancellation by Buyer without the written consent of Seller. If Seller consents to cancellation, Buyer agrees to pay Seller's expenses already incurred. Both parties certify that they have read, understood, agree to an accept the terms and conditions of this Contract (front and back) and that there is no verbal agreement other than to what has been reduced to writing and included in the Contract. If it is necessary to employ an attorney to enforce any provisions of this Contract, Buyer agrees to pay all attorney's fees and court costs incurred.

SELLER: _____   BUYER: _____

## Acceptance of Proposal

The above prices, specifications and conditions are satisfactory and are hereby accepted. NOTE: This proposal is valid for 30 days and may be withdrawn if not accepted within said 30 days.

Date of Acceptance: _____   Signature: _____

EXHIBIT
C

Michael Baradell

Keller Williams Realty Services

January 21, 2015



2015-11294J
**FILED**

APR 07 2015

MALISE PRIETO - CLERK
~~DEPUTY~~ VERONICA FELTS-FRECHOU

<u>**Via Email Only**</u>
Kristi Louque
K. Louque Law Firm, LLC
2895 Highway 190, #239
Mandeville, Louisiana 70471
klouque@klouquelawfirm.com

     Re:    Homeowner, Jessica Valderrama
             Homeowner's Property located at **108 Sugar Mill Dr., Slidell LA 70458;**

Ms. Louque:

Regarding your request for information on the property located at 108 Sugar Mill Dr., Slidell, Louisiana, I offer the following evaluation. The property was listed for sale on June 6, 2014 for $184,900. A search for comparable homes within a one- mile radius supported a sales price between $170,000 to $180,000. This listing occurred before the construction of the Walmart Neigborhood Market ("Walmart") in the backyard of the property.

The home was viewed by potential buyers and their agents approximately fifteen times. Most of the feedback from the buyers and the agents was that the home was very nice and had very nice features but was overpriced, due to the fact that it was located directly next to a Walmart.

In my professional opinion, because of the position of the Walmart in the backyard of this property, the home's current value has dropped dramatically to around $150,000. Ms. Valderrama will have significant difficulty selling the property without drastically reducing the price.

Further, upon listing the property, the home showed no visible signs of any significant damage other than normal wear and tear, and photographs were taken of the property for purposes of marketing that prove the damages to the home caused by the construction of the Walmart did not exist at the time that the home was placed on the market in June of 2014.



EXHIBIT

D

Louque, Kristi
January 21, 2015
Page 2

Please give me a call if you have any questions regarding the facts surrounding the attempted sale of the subject home.

Michael Baradell

Keller Williams Realty Services
985-710-3356









# KLLF   K. Louque Law Firm, LLC

Kristi U. Louque
klouque@klouquelawfirm.com

2895 Highway 190 ~~#239~~
Mandeville, LA 70471

2015-11294 J
FILED

APR 07 2015

MALISE PRIETO - CLERK
Deputy~~VERONICA FELTS-FRECHOU~~

February 9, 2015

**Via Email & Certified Mail &
Return Receipt Requested**

Journeyman Construction, Inc.
Attn: Jerry Kelley
8401 Jacksboro Hwy., Ste. 750
Lakeside, Texas 76135
jkelley@journeymanco.com

**Via Certified Mail &
Return Receipt Requested**

Journeyman Construction, Inc.
Through its Registered Agent
CT Corporation System
5615 Corporate Blvd., Ste. 400B
Baton Rouge, Louisiana 70808

**Via Certified Mail
Return Receipt Requested**

Journeyman Construction, Inc.
7701 N. Lamar Blvd., Ste. 100
Austin, Texas 78752

    Re:   Homeowner, Jessica Valderrama
          Homeowner's Property located at **108 Sugar Mill Dr., Slidell LA 70458;**
          Project: Walmart Neighborhood Market, located at 3100 Pontchartrain Dr.,
          Slidell, Louisiana 70458

Gentlemen:

    I represent Jessica Valderrama in relation to the damages sustained to her property as a result of the construction of the Wal-Mart Neighborhood Market recently built directly behind her home, located at 108 Sugar Mill Dr., Slidell, Louisiana 70458.

    As you are aware from my client's numerous phone calls and notice given personally to Journeyman Construction's employees, Jerry Kelley and Ron Webb, as a result of the construction that took place in close proximity to my client's home, her home now has excessive damage, including cracking in the walls, ceilings and flooring of the home.

**EXHIBIT
E**

Gentlemen
February 9, 2015
Page 2

Please see the structural engineering report by Gilbert Engineering Services, LLC attached, which evidences the damages to my client's home. Although the home is still structurally sound enough to be inhabited, the home shows numerous signs of distress caused directly by the construction of the Wal-Mart behind her home.[1]

Attached are estimates/proposals for the repairs that need to be made to fix the damages caused by Journeyman Construction during this project. The first estimate is from ECO Builders, Inc. for the releveling of the home and totals approximately $18,800. This amount is merely an estimate and subject to change upon completion of the work, depending upon any damages that could result from the releveling process.[2]

Also attached is a proposal from Tony Herring & Associates for the repair/replacement of the damaged flooring in the amount of $6,163.50. The cracking in the flooring occurred as a direct result of the construction of the Wal-Mart done near my client's home.

Further, my client had placed her home up for sale prior to the start of the construction at issue and was given a market value of the home by her real estate agent of approximately $180,000. The home was placed on the market on June 6, 2014 for $184,900. Since the construction of the Wal-Mart behind her home and because of the damages to the home, the current value of her home has dropped significantly to approximately $150,000. Because of the position of the Wal-Mart directly behind her back yard, potential buyers have chosen not to buy the home. She is entitled to payment for her loss in the value of her home.[3]

My client's approximate actual damages total around $65,000, not including any attorney's fees/costs or general damages for the inconvenience and emotional distress caused by this situation. My client endured months of excessive noise and continues to experience the inconvenience of not being able to use her back yard because of flooding issues as a result of the elevation of the land directly behind her home.[4] Ms. Valderrama has made numerous attempts to resolve this dispute, but to no avail.

It is urgent that my client resolve this matter quickly, so that she can begin the time consuming process of repairing the damages to the home and placing it back on the market for sale, as she is also very uncomfortable with living with a Wal-Mart in her back yard. Please contact me at your earliest convenience to discuss amicable resolution.

---

[1] See Gilbert Engineering Services, LLC report attached.

[2] See ECO Builders estimate attached.

[3] See letter from Michael Baradell from Keller Williams Realty Services regarding the decline in the value of the home.

[4] See photographs of dirt built up to the top of my client's fence, causing an overflow of water and drainage problems in her back yard.

Gentlemen
February 9, 2015
Page 3


     Please notify the owner of the property and provide me with a copy of the contract by and between the owner and Journeyman Construction, Inc., along with the name and contact information of Journeyman's insurer.  I look forward to hearing from within ten (10) days of the date of this letter regarding resolution.

     With kind regards, I remain,

                          Sincerely,

                          Kristi U. Louque

KUL/tmw
Attachments